## THE STATE V. RIDER, *Appellant.*

1. **Criminal Law**: INTENT : OVERT ACT.   A mere intent to commit a criminal offence is not a crime, but there must be an attempt to perpetrate it-to constitute guilt, in law.   One may arm himself for the purpose of seeking and killing an adversary and may seek and find him, yet if he is guilty of no overt act he commits no crime.

2. —— : THREATS : ASSAULTS.   One against whom threats have been made by another is not justifiable in assaulting the threatener, unless he makes some attempt to execute his threats.

8. —— : ——: CHARACTER OF DECEASED.   Where, on a trial for murder, there is evidence of threats made by the deceased against the accused, and also of the turbulent and quarrelsome character of the deceased, the jury should be allowed to consider it in determining who was the assailant, and whether defendant had reasonable ground to apprehend and did apprehend that he was in imminent danger of sustaining great bodily harm at the hands of the deceased.

4. **Evidence** : HEARSAY.   Statements made by the reputed wife of the defendant, who was a witness against him, to a third person, that defendant had beat her previous to the homicide, cannot be proved by the person to whom they were made.   They are but hearsay, and would not be admissible even if material and relevant.   Her own testimony to the same effect is irrelevant and inadmissible.

5. —— : RES GESTÆ : DYING DECLARATION.   Evidence of the wife of the deceased, that after he had gone two hundred yards from the place where he was shot and called her, and she had gone to him, traveling one hundred yards, he said to her, " Oh hun, he has killed me," or " Oh hun, he has shot me," is not admissible as part of the *res gestæ ;* nor as a dying declaration, from the uncertainty of the

The State v. Rider.

witness as to which of the two expressions was used by the deceased. If the latter exclamation was used there is nothing to show that it was made under a sense of impending death.

6. **Practice, Criminal:** IMPEACHMENT OF DEFENDANT AS A WITNESS. Where a defendant in a criminal cause testifies in his own behalf, he may be contradicted and impeached as any other witness.

*Appeal from Saline Criminal Court.* — HON. JOHN E. RYLAND, Judge.

REVERSED.

*Boyd & Sebree* and *Davis & Wingfield* for appellant.

(1) The court erred in allowing Mrs. Tallent to testify to what deceased said to her in the cornfield after he was shot. What he said was not a dying declaration and not admissible as such. 1 Greenlf. on Ev., (13 Ed.) sec. 1569 ; *State v. Jefferson*, 77 Mo. 136. It was not part of the *res gestae.* The court erred in permitting Mrs. Tallent to testify that Mrs. Rider told her in December, 1883, that " Rider had beat her up with a club, and she was afraid he would kill her." It had no connection with the case, and was hearsay. It was error. The testimony of Mary Rider as to defendant beating her in December, 1883, was improperly admitted. Its tendency was to show that defendant had been guilty of another crime, and had no tendency to prove the commission of the one for which he was on trial, or any ingredient of it. (2) The court erred in refusing to permit witnesses, Johns, Hinton, and Hightower, to testify as to threats made by the deceased, Tallent, in March, 1885, and in November, 1884. The fact that such threats had been made, in connection with the other evidence in the case, tended strongly to corroborate defendant's statement that deceased assaulted him with the axe, as well as to corroborate Johns' testimony as

to other threats. *State v. Hayden*, 83 Mo. 198 ; *State v. Elkins*, 63 Mo. 159 ; *State v. Alexander*, 66 Mo. 148 ; *State v. Lee*, 66 Mo. 165 ; *Carver v. Husky*, 79 Mo. 509 ; Wharton's Crim. Ev. [8 Ed.] sec. 857 ; *State v. Grant*, 79 Mo. 113 ; *State v. Adams*, 76 Mo. 355. (3) The court erred in giving the second instruction asked by the state. The instruction is not the law in this case, first, because it warranted the jury in finding defendant guilty of murder in the first degree, if the intent to kill existed without reference to whether there was deliberation or not ; and also warranted such finding though the intent was not to kill, but simply to do bodily harm. In this case the jury were bound to either acquit, or find for murder in the first degree, under the instructions. R. S. 1879, sec. 1232 ; *State v. Mitchell*, 64 Mo. 191 ; *State v. Deering*, 65 Mo. 530 ; *State v. Shock*, 68 Mo. 552 ; *State v. Hill*, 69 Mo. 451 ; *State v. Pacquett*, 75 Mo. 330. Second, it assumes the law to be that, without any overt act on the part of defendant, from which deceased could have apprehended danger to himself, the deceased might have made a deadly assault upon defendant, and defendant have no right to defend himself from its consequences. *State v. Thompson*, 83 Mo. 257. Third, it instructs the jury to disregard legal and proper testimony, and is calculated to mislead. (4) The court erred in permitting the state's attorney to inquire as to the general reputation of defendant for truth and veracity, morality and chastity. The defendant, under section 1918, of Revised Statutes, does not occupy the position of an ordinary witness, and cannot, by the express terms of the statute, be cross-examined, contradicted, or impeached, as any other witness. To place any other construction upon this statute, makes it contradict itself. *State v. Clinton*, 67 Mo. 390 ; 1 Greenl. on Ev. [13 Ed.] secs. 446, 455, 456 ; *State v. McGraw*, 74 Mo. 573.

*B. G. Boone*, Attorney General, for the state.

(1) Declarations made by one apprehending death, in regard to the identification of the defendant, and the act of killing, and all the circumstances immediately attending the act, and forming a part of the *res gestae*, are admissible in evidence. Whar. Crim. Ev. [8 Ed.] sec. 276, *et seq.; State v. Millen*, 13 Mo. 30; *State v. Simon*, 50 Mo. 370; *State v. Draper*, 65 Mo. 355; *State v. Kilgore*, 70 Mo. 546; *State v. Johnson*, 76 Mo. 121; *State v. Jefferson*, 77 Mo. 136; *State v. Chambers*, 87 Mo. 406. The statements made by Tallent to his wife, just after he was shot, were, under the above rule, admissible as dying declarations, being made *in extremis*, and constituting part of the *res gestae*. (2) Evidence of a defendant's conduct on other occasions, even though it discloses another crime, is admissible, although it has no other connection with the matter under inquiry than that it tends to explain or throw light upon what were his motives and intentions in committing the crime with which he is charged. Ros. Crim. Ev. [7 Ed.] 90, 92; Whar. Crim. Ev. [8 Ed.] sec. 456; *State v. Zellers*, 2 Halstead [N. J.] 220; *Hendrickson v. People*, 1 Park. Cr. R. [N. Y.] 406; *Baalam v. State*, 17 Ala. 451; *State v. Ford*, 3 Strobhart [S. C.] 517; *Heath's Case*, 1 Harrison, 507. Under the general rule, above stated, facts explanatory of why defendant's wife went to Tallent's, and why he took her across the river, were admissible in evidence. Defendant sought to extenuate his crime by attempting to prove that an improper intimacy had existed between his wife and Tallent. This could only be shown to be false, and defendant's true motive for the killing disclosed by evidence as to the cause of the wife's leaving. If this evidence disclosed the fact of defendant's brutal treatment of his wife he cannot complain. (3) The rule as to the admission of evidence as to threats, varies

with the circumstances in each particular case. In the case at bar there is no evidence that deceased was making any effort to carry any threats into execution, or that his conduct at the time he was killed was such as to cause defendant to fear that he was in great bodily danger. Hence, evidence as to threats was properly excluded. *State v. Elkins*, 63 Mo. 159 ; *State v. Evans*, 65 Mo. 574. The testimony offered by defendant, to prove that deceased was in the habit of carrying a revolver, was properly excluded. For the purpose of impeaching the testimony of a witness, the inquiry need not be confined to his veracity alone, but the examination may be extended to his general moral character. *State v. Shields*, 13 Mo. 236 ; *State v. Montgomery*, 28 Mo. 594 ; *Day v. State*, 28 Mo. 422 ; *State v. Hamilton*, 55 Mo. 520 ; *State v. Breeden*, 48 Mo. 507 ; *State v. Clinton*, 67 Mo. 391 ; *State v. Miller*, 71 Mo. 590; *State v. Grant*, 79 Mo. 133. (4) When a defendant, in a criminal case, testifies in his own behalf, the state may impeach his character before he offers evidence that it is good ; his testimony is subject to the same rules and tests as that of other witnesses. *State v. Clinton*, 67 Mo. 380; *State v. Cox*, 67 Mo. 392 ; *State v. Rugan*, 68 Mo. 214; *State v. Testerman*, 68 Mo. 408 ; *State v. Porter*, 75 Mo. 178 ; *State v. Palmer*, 88 Mo. 568. (5) The second instruction correctly declared the law. *State v. Starr*, 38 Mo. 270 ; *State v. McGuire*, 69 Mo. 200 ; *State v. Harris*, 73 Mo. 287 ; *State v. Brown*, 64 Mo. 367 ; *State v. Dunn*, 80 Mo. 693, and cases cited.

HENRY, C. J.—At the September term, 1885, of the Saline criminal court the defendant was indicted for murder for killing one R. P. Tallent, and was tried at the November term of said court, 1885, and convicted of murder in the first degree. From that judgment he has appealed to this court.

The evidence for the state proved that he killed the

deceased, and of that fact there is no question. It also tended to prove that he armed himself with a gun, and sought the deceased with the intent to kill him. The evidence tended to prove that the relations between the defendant and his wife were not of the most agreeable character, and that the deceased was criminally intimate with her, and on the day of the homicide had taken her off in a skiff to Brunswick. That defendant went in search of his wife to the residence of the deceased, armed with a shot gun, and met the latter near his residence. What then occurred no one witnessed, except the parties engaged, but defendant testified as follows: "Well, me and Mr. Merrill went to this path that was leading toward the river. When we come to that path Mr. Merrill stopped, and I went on in the direction of Mr. Tallent's house, to see if I could learn anything about where my wife was, and I discovered no sign of her there, and I started back north on this path, going down on the slough bank; after going down some distance from the bank I meets Mr. Tallent; I spoke to Mr. Tallent and asked him if he knew where my wife was, and he made this remark: 'I have taken her where you won't find her;' and he says, 'God damn you, we will settle this right here.' He started at me with his axe in a striking position, and I bid Mr. Tallent to stop; then he advanced a few feet, and I fired. I fired one time." The axe of deceased, found on the ground, had a shot in the handle near the end farthest from the blade, and on the same side as the blade, and this evidence had a tendency to corroborate the testimony of the accused, showing that the axe was pointing in the direction from which the shot came, and was held in an upright position.

The court, for the state, instructed the jury as follows:

"The court instructs the jury, that if they believe from the evidence that prior to the killing of the de-

ceased, the defendant prepared and armed himself with a gun, and went in search of, and sought out, deceased, with the intention of killing him, or shooting him, or doing him some great bodily harm, and that he did find, overtake, or intercept, deceased, and did shoot and kill deceased while he was returning from the river to his home, then it makes no difference who commenced the assault, and the jury shall not acquit the defendant; and the jury are further instructed that in such case they shall disregard any and all testimony tending to show that the character or reputation of deceased for turbulency, violence, peace and quiet was bad, and they shall further disregard any and all evidence of threats made by deceased against the defendant.''

The mere intent to commit a crime is not a crime. An attempt to perpetrate it is necessary to constitute guilt in law. One may arm himself with the purpose of seeking and killing an adversary, and may seek and find him, yet, if guilty of no overt act, commits no crime. It has been repeatedly held in this and nearly every state in the Union, that one against whom threats have been made by another is not justifiable in assaulting him unless the threatener makes some attempt to execute his threats. A threat to kill but indicates an intent or purpose to kill; and the unexpressed purpose or intent certainly affords no better excuse for an assault by the person against whom it exists than such an intent accompanied with a threat to accomplish it. The above instruction authorized the jury to convict the defendant even though he had abandoned the purpose to kill the deceased when he met him, and was assaulted by deceased and had to kill him to save his own life. It does not follow because appearances would have excused deceased had he killed the accused, that the accused had no right to defend his life against the deceased, if in fact at the time he had made no assault upon the deceased and intended none. There was evidence of threats

The State v. Rider.

made by the deceased against the accused, and also of the turbulent and quarrelsome character of the deceased, and so much of the above, and of the third, instruction given for the state, as relates to those matters, is a little obscure. The jury had a right to consider the threats made by the deceased and his character as a turbulent, dangerous man in determining the question as to who was the assailant, he or the defendant, and whether defendant had reasonable ground to apprehend, and did apprehend, that he was in imminent danger of sustaining great bodily harm at the hands of the deceased. It is not clear whether the instructions direct the jury to disregard that evidence in determining the other question, or, after having given them due consideration, they find the other facts against him. If the latter they are unobjectionable, but, on a re-trial, they should be more precise.

The court permitted the wife of the deceased to testify that on the day of, and prior to, the shooting the reputed wife of defendant said to her "that she was afraid Mart Rider would kill her," and also that in December, 1883, Mrs. Rider came to her house and told her that Mart Rider had beat her up with a club, "and that she was as bloody as a hog," and that she said Rider would kill her, and she wanted Tallent to take her to Miami to get away from him. And that when she came back from Miami in 1883 her face and side were black and blue. The court also permitted witness, Burruss, to testify that McGaw "was pretty bloody and drunk; his face was all over blood;" and Mrs. Rider to testify that she went with Tallent in December, 1883, to Miami because Rider had beaten her with a club.

This testimony was all inadmissible. Mrs. Rider, the reputed wife of the accused, was not his wife, and was a witness against him, and, of course, what she may have said to third persons, even if material and relevant, is but hearsay. This disposes of the testimony of Mrs.

Tallent in regard to statements made by Mrs. Rider to her. As to her own testimony, that, in 1883, nearly two years before this homicide, Rider beat her with a club, and she got Tallent to take her to Miami, it has no relevancy to the cause on trial. Suppose it to be the fact, would it have justified Tallent in killing Rider, or Rider in killing Tallent, in 1885? What light did it throw upon the issues of fact which the jury had to pass upon? Again, supposing it to be true, that McGaw was bloody and drunk, what had that to do with the case? He was a witness for the state, was not accused of participation in the alleged murder, and why the prosecuting attorney desired to establish the fact is inconceivable.

Mrs. Tallent was also permitted to testify that after her husband was shot he said to her, "Oh, hun, he has killed me!" or, "Oh, hun, he has shot me!" "Pray for me!" "Oh, my children!" This was after he had gone about two hundred yards from the place where he was shot, and called her, and she went to him, traveling one hundred yards. It was not admissible as part of the *res gestae.* 1 Greenl. Evid., sec. 108, and notes. It was not admissible as a dying declaration. She does not state positively what the exclamation of the deceased was. It was, as she states, *either* "Oh, hun, he has killed me!" or "Oh, hun, he has shot me!" "It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they *were made under a sense of impending death.*" 1 Greenl. Evid., sec. 158.

If his exclamation was, "Oh, hun, he has killed me!" that, taken in connection with the nature of the wound, and the short time which elapsed after he was shot before his death, would show that what he said was "under a sense of impending death." But, if the exclamation was, "He has shot me!" there is then nothing to show that he made the statement "under a sense of

impending death." Nothing to show that, although the wound was necessarily fatal, he was so impressed.

The state was permitted to introduce evidence as to the bad character of defendant for "truth, veracity and morality," "truth and veracity, chastity and morality," and his counsel contend that, inasmuch as in his testimony in chief, the accused did not testify or refer to his character, the state had no right to impeach him. While the right to cross-examine a defendant who testifies in his own behalf is limited to what is referred to by him in his testimony in chief, yet, by the express terms of the statute, he "may be contradicted and impeached as any other witness." One mode of impeaching the credit of a witness is disproving the facts stated by him. This does not necessarily discredit his veracity, but may only question the accuracy of his recollection. A party who introduces a witness may introduce other witnesses to prove a different state of facts from that testified to by him. Strictly speaking, impeaching a witness is to show that he is not worthy of belief in consequence of moral obliquity. One introducing a witness in his own behalf may not so impeach him, while he may prove facts contrary to those testified to by his witness. We are not impressed with the argument of counsel on this subject.

For the errors above noted the judgment is reversed and cause remanded. All concur.